IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 6, 2015

**GARY WAYNE BUSH v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. 68965      M. Keith Siskin, Judge**

———————————

**No. M2014-00759-CCA-R3-PC – Filed March 25, 2015**

———————————

The Petitioner, Gary Wayne Bush, appeals the Rutherford County Circuit Court's denial of post-conviction relief. He was convicted of first degree murder and sentenced to life imprisonment in the Tennessee Department of Correction. On appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to call the Petitioner to testify in his own defense. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Stephen W. Pate, Murfreesboro, Tennessee, for the Petitioner, Gary Wayne Bush.

Robert E. Cooper, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case stems from the shooting death of the victim, Lynn Orrand, on January 16, 1982. See State v. Candance Orrand Bush and Gary W. Bush, No. M2010-00186-CCA-R3CD, 2011 WL 2848266 (Tenn. Crim. App. July 18, 2011), perm. app. denied (Tenn. Nov. 17, 2011). At the time, the victim was married to the Petitioner's current wife and co-defendant, Candance Orrand Bush.[1] Id. at *1. The murder remained

---

[1] Because co-defendant Candance Orrand Bush shares the same last name as both the Petitioner and the victim, we will refer to her as Candance. We mean no disrespect by this practice.

unsolved for over twenty-five years until police received information in March 2007 that implicated Kevin Patterson, the victim's brother-in-law. Id. at *4. Mr. Patterson, who was seventeen years old at the time of the shooting, pled guilty to second degree murder in March 2008 and received a twenty-five-year sentence. Id. Based on Mr. Patterson's confession and a subsequent police investigation, the Petitioner and Candance were indicted for first degree murder. After a joint trial in which Mr. Patterson served as a key witness, the Petitioner and his wife were convicted as charged on September 16, 2008. Id. A full recitation of the underlying facts can be found in this court's opinion on direct appeal. See id. at *1-12.

The evidence at trial established that the Petitioner and Candance worked together and began having an affair. Id. at *4. In the fall of 1981, Candance introduced her younger brother, Mr. Patterson, to the Petitioner and began asking Mr. Patterson to kill the victim. According to Mr. Patterson, Candance said she wanted her husband killed because "she couldn't divorce him because he wouldn't leave her alone." Id. Mr. Patterson later asked his friend Jason Riley if he wanted to kill someone for $5,000. Id. at *5. After a meeting between Mr. Riley, Mr. Patterson, and the Petitioner, Mr. Riley hid in the victim's garage on November 18, 1981, and struck him in the head with a "tire tool." Id. at *9. Mr. Riley fled the scene when the attack failed to render the victim unconscious. Id. After the unsuccessful attempt on the victim's life, Mr. Patterson fatally shot the victim on the morning of January 16, 1982, while the victim was deer hunting. Id. at *6.

At trial, the State presented multiple witnesses to corroborate Mr. Patterson's testimony. See id. at *8-12. The proof from the Petitioner's trial most relevant to the issues raised in his petition for post-conviction relief pertains to recorded phone calls between Mr. Riley, Mr. Patterson, and the Petitioner. In its opinion on direct appeal, this court summarized the evidence as follows:

> When the investigation was reopened in 2007, the police asked Mr. Riley to make a controlled phone call to [Mr. Patterson]. The phone call was recorded and monitored by the police. Mr. Riley told [Mr. Patterson] that the police were asking him questions about the murder. [Mr. Patterson] told Mr. Riley that he "didn't have nothing to do with the f-----g s--t." When Mr. Riley brought up the attack on [the victim] in the garage, [Mr. Patterson] said that he did not "even know what you're talking about now," that he did not "know nothing about nothing," and that would "be the last word I'll say when I die." [Mr. Patterson] testified that he denied everything to Mr. Riley because he assumed his phone was taped. A day after making the controlled call to [Mr. Patterson], Mr. Riley received a telephone call at work. The caller did not identify himself, and Mr. Riley did not recognize the voice. The caller said that he knew Mr. Riley had an

upcoming interview with the police and told him "the best thing to do is stay calm, stay cool" and "[d]on't tell them nothing." Mr. Riley informed Detective [Jim] Tramel [of the Rutherford County Sheriff's Department] about the phone call and what the caller had said. Detective Tramel set up another controlled call, provided Mr. Riley with two phone numbers, and told Mr. Riley that they were for [the Petitioner]'s home and cell phones. Mr. Riley called the home number first and got no answer. Mr. Riley then called [the Petitioner]'s cell phone and spoke to a man. The phone call was recorded, and Mr. Riley testified that the recording played at trial was the phone call he made to the number Detective Tramel provided him.

At the beginning of the phone conversation, Mr. Riley asked for "Gary." [The Petitioner] responded "Yeah." Mr. Riley told [the Petitioner] that he was in his truck and calling him because the police just left his workplace after interviewing him. [The Petitioner] told Mr. Riley that he did not "need to talk on that phone" because the police "can pick them up on a scanner." After reassuring [the Petitioner] that the police were not close enough to monitor the call, Mr. Riley asked [the Petitioner] "what do you want to do." [The Petitioner] responded that he did not "want to do nothing" and that Mr. Riley needed to "[j]ust stay cool like I told you." [The Petitioner] told Mr. Riley that the police were "gonna aggravate you for a while" and that Mr. Riley "better do" what he told him. Mr. Riley testified that he recognized [the Petitioner]'s voice as the voice of the earlier caller and that he "knowed right off the bat who it was." However, Mr. Riley testified that he "couldn't put a name to" the voice but that he could identify the voice as the same person who called him at work. After listening to a portion of the recording, Detective Tramel, Terry Orrand, and [Christy] Rawls were all able to identify [the Petitioner]'s voice as the person speaking with Mr. Riley.[2] Detective Tramel also testified that he was present during the recording of the phone conversation and that the voices belonged to Mr. Riley and [the Petitioner]. A day after the controlled call, Mr. Riley got another phone call from [the Petitioner] in which [the Petitioner] asked how the police interview went and told Mr. Riley to "lose his phone number" and "don't say nothing to nobody."

Id. at *11-12. Both the Petitioner and his wife were sentenced to life imprisonment for their first degree murder convictions, and they appealed to this court. See id. at *1. On direct appeal, the Petitioner argued that the evidence was insufficient to support his conviction and that the trial court erred by admitting into evidence the recording of the

---

[2] Terry Orrand is the victim and Candance's older son. See Candance Orrand Bush and Gary W. Bush, 2011 WL 2848266, at *1. Christy Rawls is Candance's niece who stayed with Candance during the summer of 1982. See id. at *9.

phone call between the Petitioner and Mr. Riley. Id. at *1. The Petitioner further asserted that the trial court erred by failing to select alternate jurors in plain view. Id. This court concluded that because both the Petitioner's voice and the recording of the call were properly authenticated, the trial court did not abuse its discretion in admitting the recording into evidence. Id. at *16. This court affirmed the Petitioner's conviction, and the Tennessee Supreme Court denied his application for permission to appeal on November 17, 2011.

On November 13, 2012, the Petitioner filed a timely pro se petition for post-conviction relief alleging numerous grounds of ineffective assistance of counsel. He later filed an amended pro se petition on November 29, 2012. Following the appointment of counsel, the Petitioner filed a second amended post-conviction petition. The post-conviction hearings occurred on January 8, 2014, and March 4, 2014.[3]

**Post-Conviction Hearings.** Trial counsel testified that he and his father, co-counsel, were retained shortly after the Petitioner was arrested for first degree murder. At the preliminary hearing, trial counsel was the attorney of record. He agreed that Mr. Patterson confessed to the police and implicated the Petitioner. He stated that the audio recording of the Petitioner's phone call with Mr. Riley was "the most damaging piece of evidence" against the Petitioner. Trial counsel agreed that the Petitioner never identified himself in the call and that Mr. Riley received immunity from prosecution. He was also aware that the Petitioner had no criminal history prior to this case. Trial counsel acknowledged that throughout his representation, the Petitioner maintained his innocence. He agreed that the Petitioner's emphatic denial of his involvement in the murder and his lack of a criminal record could have affected jury deliberations.

Trial counsel stated that he informed the Petitioner of the value of testifying but also advised the Petitioner of the risks, including the potential opportunity for the jury to hear the Petitioner's voice and to compare it to the audio recording. He opined that a jury identification of the Petitioner's voice would have jeopardized the defense. He recalled that the Petitioner admitted to counsel that it was his voice on the recording. Trial counsel said that he and co-counsel exhaustively reviewed the recording and determined

---

[3] On appeal, the Petitioner raised the sole issue of ineffective assistance of counsel regarding the Petitioner's decision not to testify in his own defense at trial. Accordingly, we only address testimony from the hearing relevant to this issue. We also note that much of the testimony at the hearings related to whether the Petitioner heard the recording of the phone call prior to trial. At the January 8, 2014 evidentiary hearing, the Petitioner first raised the claim that his counsel failed to play the recording for him. The Petitioner did not include this claim in either of his pro se petitions or in his second amended petition, and has therefore waived the issue. See, e.g., T.C.A. § 40-30-110(c) ("Proof upon the petitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition."); Cone v. State, 747 S.W.2d 353, 356 (Tenn. Crim. App. 1987) (Issues that were not raised in the post-conviction petition are waived on appeal).

that the trier of fact could find beyond a reasonable doubt that the voice belonged to the Petitioner.

Trial counsel testified that he and co-counsel were also concerned that the Petitioner had a bad temper and would "lose his cool" during cross-examination. He said that the Petitioner was "easily riled" and adamant about his innocence, even during friendly conversations with counsel. He opined that these negative factors outweighed any potential benefit of calling the Petitioner to testify. Despite trial counsel's reservations and advice, he said that the decision of whether to testify or not is left to the client. He stated that he discussed the pros and cons with the Petitioner and determined that it was not in the Petitioner's best interest to take the stand. He said that they discussed the matter "at length and on numerous occasions." Trial counsel agreed that the Petitioner could have explained to the jury what he meant in the recording. However, he and co-counsel were concerned about the Petitioner's temper. He opined that the recording was vital to the prosecution and that it was not worth the risk to call the Petitioner to the stand. Even in hindsight, trial counsel did not believe that the Petitioner should have testified on his own behalf. In his view, the Petitioner's testimony would have harmed the defense, given the admission of the recording and Mr. Patterson's confession.

On cross-examination, trial counsel testified that he had been practicing criminal law for nearly twenty-four years. He said that he had a good working relationship with the Petitioner and that they met "dozens of times" prior to trial and shared "countless" phone calls. He further stated that he had an outstanding working relationship with Candance's counsel and that they regularly communicated in preparation for the joint trial. He agreed that the attorneys for both co-defendants vigorously cross-examined Mr. Patterson at the preliminary hearing and at trial. Trial counsel said that the audio recording was a problem for the defense, particularly because Mr. Riley asked for Gary, and the male voice responded affirmatively. He agreed that the trial prosecutor was excellent at cross-examination. He acknowledged that the Petitioner's testimony would have directly contravened many of the State's witnesses, including Mr. Riley and Mr. Patterson. He opined that it would have been difficult to explain the contents of the recording to the jury. Although trial counsel advised the Petitioner not to testify, he stated that the Petitioner made the ultimate decision.

Co-counsel testified that he began practicing law in 1967. Having tried numerous murder cases, he said that he always called his client to testify if it were in the best interest of the defendant. However, co-counsel advised the Petitioner not to testify in this case because it would have been detrimental to the defense. Even though the surname "Bush" was not mentioned in the call, the individual told Mr. Riley to remain quiet to the authorities. Co-counsel agreed that there was no expert witness at trial to provide voice identification but recalled that two or three lay witnesses identified the Petitioner's voice.

While acknowledging that the Petitioner could have testified that the voice was not his, co-counsel was concerned that the Petitioner would be vulnerable to cross-examination. He agreed that the Petitioner had no prior criminal record and had consistently denied involvement in the victim's murder. However, co-counsel noted that the Petitioner would have had to explain Mr. Riley's testimony about calling the Petitioner's number. Even if the Petitioner had the opportunity to explain the context of the phone call, co-counsel considered the content of the recording to be incriminating. He did not believe that the Petitioner would be a good witness due to his potential demeanor and because "there [we]re too many things that [the Petitioner] would have to try to explain away." After weighing the factors involved, co-counsel recommended that the Petitioner should not testify. He said that he and trial counsel would never deny a client the right to testify. He agreed that the Petitioner probably would have testified if counsel had recommended it. Co-counsel stated that if the Petitioner had insisted on testifying, then he and trial counsel would have called the Petitioner to the stand despite their advice against it.

The Petitioner testified that he retained trial counsel and co-counsel in 2007 after he was indicted. From the start, he told his counsel that he was not involved in the victim's murder. He said that counsel told him and his wife, "[Y]ou don't put a defendant on the stand." The Petitioner could not recall which counsel told him not to testify. He estimated that counsel advised him not to testify shortly after he had hired them. He said that he had never been in trouble before and accepted counsel's advice without asking any questions. The Petitioner stated that he never heard the recording involving Mr. Riley until the trial. He also did not receive a transcript of the recording before trial. He said that trial counsel and co-counsel did not discuss the recording with him beyond stating that "it looked bad." He denied that counsel ever discussed the pros and cons of testifying with him either before or during the trial. The Petitioner did not remember counsel ever telling him that the prosecutor would be rigorous and effective in cross-examining him. He said he waived his right to testify at trial because counsel directed him to do so. The Petitioner disagreed that he was hot-tempered or that he would have been angry on the stand. He said that he would have testified if counsel had recommended it.

On cross-examination, the Petitioner testified that he hired both his counsel based on the recommendation of Candance's counsel. He believed that trial counsel and co-counsel were prepared and competent, and he did not complain about their representation at the time. He agreed that if he had testified, he would have denied that the voice on the recording belonged to him. The Petitioner denied that Candance's counsel ever played the recording for him during an office visit. He maintained that the voice on the recording was not his voice. He said that he hired his counsel to handle everything and that he deferred to them. The Petitioner denied ever asking counsel about their theory of the defense. He estimated that they met more than twenty times, but he could not recall

what they discussed. He also could not remember the questions that the trial court had asked him regarding his decision not to testify.

The State called Candance's counsel after the close of the Petitioner's proof. Candance's counsel testified that he had been practicing law for thirty-eight years. He said that he was "shocked" to hear the Petitioner deny ever listening to the recording in his office because he had played the recording for the Petitioner. He explained that counsel for both the Petitioner and his wife often worked together and shared responsibilities. Candance's counsel considered the recording to be "devastating" and extensively discussed the possibility of severing his client's case from that of the Petitioner. However, Candance insisted on having a joint trial with the Petitioner.

The Petitioner testified on rebuttal that he did not recall visiting the office of Candance's counsel to hear to the recording. He further denied listening to the recording with his own counsel. He stated that the recording did not affect his decision about testifying at trial because his counsel had already told him that defendants do not take the stand.

On surrebuttal, trial counsel testified that "[t]here [wa]s no way that [he] would have ever told any defendant that defendants never take the stand." He stated that the Petitioner was "mistaken" if he believed that counsel made such a broad statement because trial counsel has called criminal defendants to the stand before.

Candance Orrand Bush testified as a rebuttal witness for the Petitioner. She did not recall going to her counsel's office with the Petitioner to listen to the recording prior to trial.

Following the evidentiary hearings, the post-conviction court took the matter under advisement. On March 18, 2014, the court entered a written order denying relief. The Petitioner timely appealed the post-conviction court's order.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel and co-counsel were ineffective in failing to call him to testify in his own defense. He contends that counsel should have presented him as a witness because he had no prior criminal history, he had consistently maintained his innocence, and he could have provided an explanation for the recording of the phone conversation with Jason Riley. The Petitioner asserts that counsel's failure prevented him from presenting important testimony and issues for the jury to consider. We conclude that the court properly denied post-conviction relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the

components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

In its order denying relief, the post-conviction court specifically held that the Petitioner failed to establish deficiency based on counsel's representation:

> With regard to the Petitioner's decision not to testify at trial, the Court finds that this decision was made solely by the Petitioner after consultation with and advice from trial counsel; the Court specifically discredits the Petitioner's assertion that trial counsel categorically refused to put him on the witness stand. The Petitioner participated in a Momon hearing during the trial (as required by law), further demonstrating his understanding of his right to testify, and documenting his decision not to do so. The Court further finds that Petitioner's testimony regarding his not having heard the audio recording of the telephone conversation (Exhibit 3) prior to trial was not credible. Furthermore, the Court finds that Candance Bush's testimony regarding this issue was not credible. The Court believes that the discovery of this recording was a critical and defining moment for the defense, and it strains credulity to believe that the recording was not played for [the Petitioner] . . . before the trial began. The Court found both [Candance's counsel] and [trial counsel] to be credible on this point. This

-9-

Court believes that the recording was played for, and discussed with, [the Petitioner] prior to the trial, and that the existence of the recording weighed heavily in [the Petitioner]'s strategic decision not to testify.

We conclude that the record does not preponderate against the post-conviction court's findings of fact. At the evidentiary hearing, the Petitioner maintained that he did not testify at trial because he deferred to counsel's statement that "you don't put a defendant on the stand." Apart from this bare assertion, the Petitioner offered no proof to support his claims. When asked about the Momon hearing, the Petitioner could not recall the trial court's questions about waiving his right to testify. Although he acknowledged meeting with counsel over twenty times, the Petitioner could not recall the content of their discussions. Moreover, he denied that counsel ever reviewed the costs and benefits of testifying with him.

Despite acknowledging the Petitioner's lack of a criminal record and his consistent assertion of innocence, both trial counsel and co-counsel opined that it would not have been in the Petitioner's best interest to testify at trial. Specifically, trial counsel testified that the Petitioner's "goose was cooked" if the jury identified his voice as the one in the recording with Mr. Riley. Furthermore, counsel was concerned that the Petitioner was quick-tempered and would have been vulnerable to the State's cross-examination. Apart from the Petitioner's own testimony, which was discredited by the post-conviction court, the Petitioner has not presented any proof that he was coerced into waiving his right to testify or that counsel prevented him from taking the stand. Accordingly, he has failed to prove his factual allegations by clear and convincing evidence, and he is not entitled to relief.[4]

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE

_____

[4] Because the Petitioner has made an insufficient showing of deficiency, we need not address the issue of prejudice. See Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

-10-